UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RESHINA WARREN,                          )
                                         )
                    *Plaintiff*,         )
                                         )
        *vs*.                            )        No. 1:20-cv-02461-JMS-DML
                                         )
THE TRUSTEES OF INDIANA UNIVERSITY,      )
                                         )
                    *Defendants*.        )

## ORDER

On September 24, 2020, Plaintiff Reshina Warren filed this lawsuit against her former employer, the Trustees of Indiana University[1] ("IU"), alleging race and gender discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981.[2] [Filing No. 1.] IU filed a Motion for Summary Judgment, [Filing No. 46], which is now ripe for the Court's review.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court

---

[1] Ms. Warren initially named Indiana University–Purdue University Indianapolis and Indiana University as the Defendants in this case. [Filing No. 1.] However, the Trustees of Indiana University were substituted as the proper legal entity for suit pursuant to Ind. Code § 21-27-4-2. [Filing No. 16.]

[2] In her response to the presently pending motion, Ms. Warren voluntarily withdrew her claims of discrimination under 42 U.S.C. § 1981, which leaves only Ms. Warren's Title VII race and gender discrimination claims remaining. [Filing No. 52 at 25.]

what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir.

2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  IU's Conflicts and Appropriate Use Policies

All IU employees are required to abide by the terms of the Conflicts of Interest and Commitment Policy (UA-17) (the "Conflicts Policy") as well as the Appropriate Use of Information Technology Resources Policy (IT-01) (the "Appropriate Use Policy"). [Filing No 47-3 at 1; Filing No. 47-6 at 2; Filing No. 47-17 at 1.]

#### 1.  *The Conflicts Policy*

The Conflicts Policy requires, among other things, that all employees "[d]isclose potential conflicts of interest and conflicts of commitment and adhere to any requirements created to manage or eliminate those conflicts." [Filing No. 47-3 at 2.] The Conflicts Policy identifies conflicts of commitment as when an employee devotes time or effort to external activities which interfere with the fulfillment of their IU responsibilities, or when an employee "makes unauthorized use of [IU] resources in the course of an external activity." [Filing No. 47-3 at 6.] The Conflicts Policy further provides that "employees are expected to devote their [IU] work activities to official functions of [IU], and to use [IU] resources only in the interest of [IU]." [Filing No. 47-3 at 8.] "Violations of [the Conflicts Policy] will be addressed in accordance with applicable [IU] policies and

procedures, which may include disciplinary actions up to and including termination from [IU] and/or criminal prosecution." [Filing No. 47-3 at 13.]

### 2. *The Appropriate Use Policy*

The Appropriate Use Policy provides that IU technology resources may not be used for "private commercial activities that are not approved" or for "personal private gain." [Filing No. 47-17 at 1.]  Commercial activities include economic activities that are "ordinarily intended to result in a profit, and that are not part of one's [IU] responsibilities." [Filing No. 47-17 at 2.] However, commercial activities do not include incidental personal use. [Filing No. 47-17 at 2.] Examples of incidental personal use include using "email to send personal messages to friends, family, or colleagues." [Filing No. 47-17 at 2.] Failure to comply with the Appropriate Use Policy may result in sanctions, including "immediate termination of employment." [Filing No. 47-17 at 3.]

### B.  Ms. Warren's Employment with IU

Ms. Warren, who is a Black female, began working for IU in a human resources position in the Division of Enrollment Management ("DEM") in 2014. [Filing No. 47-1 at 2-3.] In her role with DEM, Ms. Warren served as the point of contact for DEM's financial and human resource needs. [Filing No. 47-1 at 2-3.] Ms. Warren's role was a full-time staff position, with a regular schedule of Monday through Friday from 8:00 a.m. to 5:00 p.m. [Filing No. 47-1 at 2-3.] As part of her employment with IU, Ms. Warren was provided with a computer and a Surface Pro tablet to complete her IU work. [Filing No. 47-1 at 2-3.] In October of 2017, Ms. Warren was promoted to the Director of Finance and Administration for DEM. [Filing No. 47-1 at 3.] Ms. Warren's new role was also considered a human resources position, and Ms. Warren remained a full-time staff

member with a regular schedule of Monday through Friday from 8:00 a.m. to 5:00 p.m.  [Filing No. 47-1 at 2-3.]

Concurrent with her employment at IU, Ms. Warren held at least two other jobs for outside employers.  [Filing No. 47-1 at 4-6.]  Beginning in July of 2014 and continuing throughout her employment with IU, Ms. Warren served as Sig Media's "HR Finance Manager."  [Filing No. 47-1 at 4.]  In her role with Sig Media, Ms. Warren worked approximately five hours per week and completed a variety of human resources functions, including payroll and new employee on-boarding.  [Filing No. 47-1 at 4-5.]  In 2018, Ms. Warren was also employed by Top Knotch, where she provided payroll and human resources services.  [Filing No. 47-1 at 5.]

While Ms. Warren may have "generally mentioned that she had a part-time job," she did not submit a disclosure form to IU regarding her employment with Sig Media or Top Knotch, nor did she receive approval from IU to have outside employment.  [Filing No. 47-1 at 6; Filing No. 47-6 at 2.]  While it was "not [her] general practice," Ms. Warren admits that she "may have" performed her job duties for Sig Media and Top Notch during her regular work hours at IU.  [Filing No. 47-1 at 5-6.]  Ms. Warren further admits that she used her IU computer and Surface Pro, rather than her personal computer, to complete her outside employment duties because "it was just convenient versus going between two computers." [Filing No. 46-1 at 6.]

### C.  Dr. Bradshaw's Employment with RNL and IU

Dr. Boyd Bradshaw, who is a White male, serves as IU's Associate Vice Chancellor for Enrollment Management and Chief Enrollment Officer.  [Filing No. 47-4 at 1.]  In his role with IU, Dr. Bradshaw directs the operations of DEM as well as the Office of Undergraduate Admissions, the Office of Student Financial Services, the Office of the Registrar, and the Office for Veterans and Military Personnel.  [Filing No. 47-4 at 1.]  Dr. Bradshaw is also responsible for

the "formulation and implementation of an IUPUI Strategic Enrollment Management Plan." [Filing No. 47-4 at 1.] Unlike Ms. Warren, Dr. Bradshaw is considered "on call all the time," [Filing No. 47-5 at 8; Filing No. 51-6 at 7], and was expected to conduct business "at odd hours" when necessary, [Filing No. 47-2 at 1; Filing No. 47-7 at 1]. Dr. Bradshaw became Ms. Warren's supervisor on or around September 26, 2016 and remained her supervisor through the date of her termination. [Filing No. 47-1 at 3-4; Filing No. 51-2 at 10.]

Since 2011, Dr. Bradshaw has served as a consultant for Ruffalo Noel Levitz ("RNL") where he provides "strategic enrollment consulting" services. [Filing No. 47-4 at 1; Filing No. 47-8 at 3-4; Filing No. 51-2 at 5-6.] Specifically, Dr. Bradshaw's role at RNL involves acting as a facilitator for "other higher education institutions to create recruitment and/or strategic enrollment plans." [Filing No. 47-4 at 1.] To complete his consulting work, Dr. Bradshaw travels to colleges and universities across the country for site visits for up to two days at a time. [Filing No. 47-8 at 4-5.]

On July 25, 2016, IU offered Dr. Bradshaw employment in his current role. [Filing No. 47-7.] IU was aware of Dr. Bradshaw's role at RNL prior to hiring him and noted in Dr. Bradshaw's offer letter that Dr. Bradshaw's work as a consultant for RNL made his new role at IU "a natural fit." [Filing No. 47-5 at 7; Filing No. 47-7; Filing No. 51-6 at 8.] Dr. Bradshaw began his position at IU on or around September 26, 2016. [Filing No. 47-1 at 5; Filing No. 47-7 at 2; Filing No. 47-8 at 2; Filing No. 51-2 at 4.]

In November of 2016, Dr. Bradshaw completed a Disclosure Form that disclosed his outside employment with RNL. [Filing No. 47-2 at 1; Filing No. 47-9 at 1.] Dr. Bradshaw's outside employment was approved by IU in December of 2016. [Filing No. 47-9 at 1.] A Conflict

Management Plan ("CMP") was then created to ensure compliance with the IU Conflicts Policy. [Filing No. 47-10.]

As part of his CMP, Dr. Bradshaw had regular meetings with his supervisor, Dr. Kathy Johnson, to discuss his relationship with RNL and the CMP.  [Filing No. 47-5 at 3-7; Filing No. 47-8 at 4-5; Filing No. 47-10; Filing No. 51-2 at 5-6; Filing No. 51-6 at 6-7.]  Additionally, the CMP required that Dr. Bradshaw utilize paid time off ("PTO") if he engaged in RNL work during regular business hours and was unable to complete a full 8-hours of IU-related work during a business day.  [Filing No. 47-5 at 6-7; Filing No. 47-8 at 6-8; Filing No. 51-2 at 7-9; Filing No. 51-6 at 7-8.]

### D.  IU's Decision to Terminate Ms. Warren's Employment

As part of IU's information technology ("IT") protocol, the DEM servers were scanned to "identify private information and data that is stored on [IU's] servers" and "limit the amount of critical data exposure that could cause harm to [IU] and its community if compromised."  [Filing No. 47-11 at 1.]  A scan of the DEM servers in the fall of 2019 revealed that Ms. Warren had saved approximately 350 files containing sensitive information, including social security numbers and banking information, in her personal folder on the DEM server.  [Filing No. 47-11 at 2.]  Further investigation revealed that these files were not related to Ms. Warren's role at IU and that Ms. Warren had completed a variety of tasks for outside companies, including creating invoices, managing payroll, providing employment verification, and creating contracts.  [Filing No. 47-13 at 1.]  Metadata for the files found in Ms. Warren's personal folder indicated that "most of the files were created, modified, and saved on weekdays during regular [DEM] hours" and that "documents for these private companies were likely printed on [DEM] printers."  [Filing No. 47-13 at 1.]

The matter of Ms. Warren's potential misconduct was referred to Juletta Toliver, IU's Senior Human Resources Director, and Shawn Bryant, IU's Employee Relations Consultant, for additional review.  [Filing No. 47-6 at 2; Filing No. 47-15 at 3-4; Filing No. 51-5 at 4-5.]  Ms. Toliver and Mr. Bryant independently reviewed the contents of Ms. Warren's personal folder and determined that it was "more likely than not" that Ms. Warren had "conducted work for outside employers during IU business hours and while being compensated by IU" and had utilized IU equipment.  [Filing No. 47-6 at 2; Filing No. 47-15 at 3-4; Filing No. 51-5 at 4-5.]

Ms. Toliver confirmed that there was "no record of Ms. Warren completing a disclosure form for her other work or that she disclosed to anyone at IU that she performed work for other employers during IU business hours."  [Filing No. 47-6 at 2; Filing No. 47-15 at 3-4; Filing No. 51-5 at 4-5.]  Ms. Toliver and Mr. Bryant then shared their findings during a meeting with Dr. Bradshaw.  [Filing No. 47-6 at 2.]  At that meeting, it was determined that Ms. Warren would be given an "opportunity to explain what had occurred" and to "provide some sort of explanation to show that she had not violated IU policies."  [Filing No. 47-6 at 2.]

On January 28, 2020, Dr. Bradshaw, Ms. Toliver, and Mr. Bryant met with Ms. Warren to discuss the files found on her computer.  [Filing No. 47-6 at 2.]  Following that meeting, Ms. Toliver and Mr. Bryant recommended that Dr. Bradshaw terminate Ms. Warren.  [Filing No. 47-6 at 2.]  On January 31, 2020, Ms. Warren's employment was terminated.  [Filing No. 47-16; Filing No. 51-3.]

### E.  Ms. Warren's Charge of Discrimination and Lawsuit

On April 24, 2020, Ms. Warren filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), stating: "I was notified that files were found on my computer related to a second job that I have, and I was therefore terminated. . . . Other white,

8

male individuals had also used their work computers to complete work that was for outside employment, but these individuals were not terminated." [Filing No. 47-18 at 1.]  Ms. Warren then filed the present lawsuit on September 24, 2020.  [Filing No. 1.]  After voluntarily withdrawing her § 1981 discrimination claims, only Ms. Warren's Title VII race and gender discrimination claims remain.

### III.
### DISCUSSION

IU argues that Ms. Warren cannot establish a prima facie case of discrimination on the basis of race or gender.  [Filing No. 48 at 15-21.]  IU also argues that Ms. Warren attempts to defeat summary judgment through a sham affidavit.  [Filing No. 58 at 6-9.]  The Court addresses the arguments regarding Ms. Warren's affidavit first, and then turns to the arguments concerning the merits of Ms. Warren's claims.

### A.    Ms. Warren's Affidavit

In support of her Response to IU's summary judgment motion, Ms. Warren submitted an affidavit.  [Filing No. 51-1.]  IU argues that Ms. Warren's affidavit is an attempt to create a "sham material fact in an effort to avoid summary judgment" and that it contradicts her previous deposition testimony. [Filing No. 58 at 6-9.]  Specifically, IU argues that Ms. Warren's declaration that she "avoided doing any of her part-time consulting work for other companies during [IU's] normal business hours" contradicts her previous testimony that she "may have" performed work for outside employers during IU work hours.  [Filing No. 58 at 7 (citing Filing No. 47-1 at 5-6 and Filing No. 52 at 4).]   IU further argues that Ms. Warren's affidavit is internally contradictory because she elsewhere asserts that "even if she did occasionally perform work for those businesses during IU work hours, she did so only during lunch or a break."  [Filing No. 58 at 7 (citing Filing No. 51-1 and Filing No. 52 at 4).]  IU argues that Ms. Warren was "directly asked in her deposition

to elaborate on when she performed non-IU work during IU work hours," but Ms. Warren never stated that she only performed non-IU work during her lunchtime or break time.  [Filing No. 58 at 7.]

Ms. Warren responds that "there is nothing contradictory about [her] affidavit," but rather her affidavit clarifies her previous deposition testimony, which was ambiguous and affected by a lapse in memory.  [Filing No. 62 at 2.]  Accordingly, Ms. Warren argues that there is no basis for excluding her affidavit.  [Filing No. 62 at 3.]

The Seventh Circuit has observed that "the first step in the summary-judgment process is to ask whether the evidentiary record establishes a genuine issue of material fact for trial."  *James v. Hale*, 959 F.3d 307, 310–11 (7th Cir. 2020) (internal citations omitted).  When considering the evidentiary record, the Court may "disregard an affidavit that attempts to create a sham issue of fact."  *Id.*  Accordingly, the sham-affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."  *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018).  However, exceptions exist to the sham-affidavit rule, including when a supplemental affidavit seeks to clarify ambiguous or confusing deposition testimony, or if the earlier testimony was the result of a memory lapse.  *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015).

Ms. Warren's affidavit states that she "avoided doing any of [her] part-time consulting work for other companies during [IU's] normal business hours.  [She] may have occasionally [done] work for other companies during [her] lunch time or break time during [IU's] normal business hours, but that was done sparingly."  [Filing No. 51-1 at 2-3]  However, Ms. Warren testified at her deposition as follows:

10

Q. Okay, so your employment still with Top Knotch, did you perform any of those job duties on weekdays during IU business hours?

A. It was not my general practice.

Q. So does that mean maybe sometimes but just not very often?

A. I may have – I do not recall – but it was not my general practice to do so.
 . . . .

Q. When shifting back to your employment with Sig Media, do you remember if you performed any of those job duties during the weekdays during those 8:00 to 5:00 business hours?

A. It was not my general practice to.

Q. So the same as Top Knotch?

A. Same as Top Knotch, correct.

[Filing No. 47-1 at 20.]

While Ms. Warren's affidavit may arguably seek to clarify her previous statement that she "may have" performed work during business hours for outside employers but only during "lunch time or break time," her affidavit also directly contradicts her deposition testimony.  Ms. Warren's affidavit states that while her IU-issued computer contained documents related to her outside employment, she "did not do any work with those documents" but "downloaded the documents on [her] laptop to simply store them."  [Filing No. 51-1 at 2-3]  However, Ms. Warren's deposition contained the following testimony:

Q. So did you use any of those IU computers or the Surface Pro for your Top Knotch job?

A. Yes.
 . . . .

Q. And then would it be the same that you also used the IU computer or IU equipment, I guess, whatever you had at that time, to perform those duties [with Sig Media]?

A. Correct.

. . . .

Q. Did you have a personal computer at the time?

A. Yes.

Q. So is there a reason that you used the IU computer instead of your personal computer for that work?

A. Convenience.

[Filing No. 47-1 at 20.]

Ms. Warren's attestation that she merely used her IU computer for storage clearly contradicts her deposition testimony that she performed work on her IU computer because it was convenient to do so. The Court also notes that Ms. Warren's affidavit is inconsistent with her EEOC Charge, which she submitted under penalty of perjury and in which she stated: "[o]ther white, male individuals had also used their work computers to complete work that was for outside employment, but these individuals were not terminated." [Filing No. 47-18 at 1.]

Taken together, the inconsistencies between Ms. Warren's affidavit and her prior testimony suggest that her affidavit is an attempt to "shore up obvious gaps in [her] prima facie case with phantom evidence." *Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292 (7th Cir. 1996). Accordingly, Ms. Warren's affidavit is properly excluded, and the Court will not consider it in resolving the summary judgment motion

### B.    Ms. Warren's Title VII Claims

Turning to Ms. Warren's Title VII claims, the Court notes that the parties' arguments do not separately discuss Ms. Warren's race and gender discrimination claims. Specifically, IU argues that Ms. Warren cannot establish a prima facie case of race or gender discrimination under the

framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  [Filing No. 48 at 15-21.]

Ms. Warren responds that whether the Court considers her claims under the *McDonnell Douglas* framework or in light of the evidence taken as a whole, a reasonable factfinder would conclude that Ms. Warren's race and gender caused her termination.  [Filing No. 52 at 26-33.]

IU replies that "the undisputed facts show that IU's sole reason for terminating Ms. Warren's employment was her clear violations of IU's Conflicts Policy," and Ms. Warren "fails to present any evidence suggesting a nexus between her race or gender and the decision to terminate her employment."  [Filing No. 58 at 1-2.]

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In discrimination cases, "[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), reh'g denied (July 31, 2020) (internal citations omitted).

The Seventh Circuit clarified in *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760 (7th Cir. 2016), that regardless of whether courts use the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination claims, "the singular question that matters in a discrimination case" is whether "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."

*Johnson v. Advoc. Health & Hosps. Corp.,* 892 F.3d 887, 894 (7th Cir. 2018) (citing *Ortiz*, 834 F.3d at 765).  However, the Seventh Circuit has not completely dispensed with the separate tests or methods to analyze discrimination cases, including the *McDonnell Douglas* framework, for evaluating discrimination cases.  *Ortiz,* 834 F.3d at 766.

Because Ms. Warren argues that she has established discrimination under both *McDonnell Douglas* and *Ortiz*, the Court will separately consider Ms. Warren's race and gender discrimination claims under both approaches as outlined below.

### 1. Race Discrimination

### a.   The *McDonnell Douglas* Framework

Under the *McDonnell Douglas* framework, Ms. Warren must establish a prima facie case by showing that: (1) she is a member of a protected class; (2) she performed in accordance with IU's legitimate expectations; (3) she was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably.  *See David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).  Once that has been established, the burden then shifts to IU to rebut the prima facie case by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection."  *McDonnell Douglas,* 411 U.S. at 802.  Then, Ms. Warren may only prevail if she can show that IU's response is merely a pretext for behavior actually motivated by discrimination.  *See id.* at 792.

Here, the parties do not dispute that the first and third requirements of Ms. Warren's prima facie case are established.  Ms. Warren is a member of a protected class because she is Black, and she suffered an adverse employment event when she was terminated on January 31, 2020.  [*See* 42 U.S.C. § 2000e-2; Filing No. 51-1; Filing No. 51-2 at 12.]  However, IU disputes whether Ms.

Warren was meeting IU's legitimate expectations and whether similarly situated employees outside of her protected class were treated more favorably.

### i.       IU's Legitimate Expectations

IU argues that Ms. Warren failed to meet its legitimate expectations because she violated its Conflicts Policy in three ways: (1) "by failing to disclose the work she was performing for outside employers during IU business hours"; (2) "by working for outside employers during IU business hours without having a management plan in place to address the conflict, and therefore, accepting payment from IU while she was performing outside work"; and (3) "by using her IU computer to perform work for outside employers." [Filing No. 48 at 16.]

Ms. Warren argues that not only was she meeting IU's legitimate expectations, but she was also being considered for an expanded role at the time of her termination. [Filing No. 52 at 31.] Ms. Warren further argues that, to the extent that IU claims that Ms. Warren was not meeting its legitimate expectations because she worked for another employer during business hours, IU is applying its policies in a discriminatory way because Dr. Bradshaw engaged in the same conduct but was not terminated. [Filing No. 52 at 32.]

IU replies that it is "undisputed" that Ms. Warren violated the Conflicts Policy, but "even if IU was mistaken that Ms. Warren performed non-IU work during IU work hours, Ms. Warren has produced no evidence that IU did not honestly believe that she engaged in such conduct." [Filing No. 58 at 16-17.]

In assessing whether an employee was meeting an employer's legitimate expectations, "the inquiry must focus on [the employee's] performance at the time of [her] dismissal." *Anders v. Waste Mgmt. of Wis., Inc.,* 463 F.3d 670, 676 (7th Cir. 2006); *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 545 (7th Cir. 2002) ("[T]he question is not whether at any time in

[the employee's] employment [she] was meeting [her] employer's expectations; the question is whether [she] was meeting [her] employer's expectations at the time [she] was terminated.").

While the record demonstrates that Ms. Warren was held in high regard by her colleagues and was meeting her employer's expectations with respect to the performance of her day-to-day job duties, [Filing No. 51-2 at 10; Filing No. 51-5 at 5], she nevertheless failed to meet IU's expectations at the time of her dismissal when IU discovered that Ms. Warren had failed to disclose her outside employment and had completed work for outside employers during IU business hours without having a CMP in place to mitigate the potential for conflicts.  Ms. Warren's conduct is a violation of the IU Conflicts Policy and the IU Appropriate Use Policy, and the record establishes that IU had a "very strict . . . zero tolerance" policy regarding violations of these policies.  [Filing No. 47-3 at 13; Filing No. 47-5 at 5; Filing No. 47-13 at 3.]  Additionally, the Court notes Ms. Toliver's observation that Ms. Warren's conduct is "particularly egregious" because Ms. Warren's former position was in human resources and, thus, she was "intimately aware that she should have disclosed her non-IU work and should have had a management plan in place to prevent these policy violations" because she had "held others . . . accountable for their inappropriate behavior and/or performance." [Filing No. 47-6 at 2.]  The Court finds that IU had a legitimate expectation that its human resources professionals would understand and abide by its employment policies, and the undisputed evidence shows that Ms. Warren did not do so.

Accordingly, Ms. Warren has failed to demonstrate that she met her employer's legitimate expectations and, consequently, has failed to establish her prima facie case.

### ii.    Similarly Situated Employees

While the Court has already found that Ms. Warren has failed to establish a prima face case of race discrimination because she has not shown that she was meeting IU's legitimate

16

expectations, the Court also considers whether she has shown that IU treated similarly situated employees outside of her protected class more favorably.

IU argues that Ms. Warren has failed to establish that a similarly situated employee outside of her protected classes received more favorable treatment.  IU argues that while Ms. Warren points to Dr. Bradshaw in support of her claims, he is not a proper comparator because Dr. Bradshaw is not subject to the same decisionmaker as Ms. Warren and Dr. Bradshaw did not engage in comparable policy violations.  [Filing No. 48 at 18-21.]

Ms. Warren responds that Dr. Bradshaw is a proper comparator to Ms. Warren because "[c]ommon sense suggests that if a supervisor holds his subordinates to a certain standard, then he must hold himself to the same standard."  [Filing No. 52 at 33-34.]  Additionally, Ms. Warren argues that both she and Dr. Bradshaw were subject to the same rules and regulations and completed work for another employer during IU's normal business hours, yet Dr. Bradshaw has not "treated himself as harshly" as he treated Ms. Warren.  [Filing No. 52 at 33.]

IU replies that "it is unreasonable to infer that Dr. Bradshaw has the authority to and would be in charge of disciplining himself."  [Filing No. 58 at 11-12.]  IU further argues that Ms. Warren and Dr. Bradshaw did not engage in similar conduct because Dr. Bradshaw disclosed his work with RNL and entered into a CMP.  [Filing No. 58 at 12.]

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (internal citations omitted).  The purpose of  determining if employees are "similarly situated" is to eliminate "other possible explanatory variables, such as differing roles, performance histories, or decision-making

personnel, which helps isolate the critical independent variable – discriminatory animus."
*Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal citations omitted).

Although they need not be identically positioned, "similarly situated employees must be
directly comparable to the plaintiff in all material respects." *Patterson v. Indiana Newspapers,
Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (internal citations omitted). "In the usual case a plaintiff
must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the
same standards, and (3) engaged in similar conduct without such differentiating or mitigating
circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman,*
667 F.3d at 846 (internal quotes and citations omitted). "Whether a comparator is similarly situated
is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which
a reasonable factfinder could conclude that the plaintiff met [her] burden." *Johnson v. Advoc.
Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

While Ms. Warren points to Dr. Bradshaw as a similarly situated colleague outside of her
protected classes who received more favorable treatment, Dr. Bradshaw fails as a meaningful
comparator for two reasons. As an initial matter, Ms. Warren has not demonstrated that both she
and Dr. Bradshaw reported to the same supervisor – or put differently, that Ms. Warren and Dr.
Bradshaw would have been disciplined by the same decisionmaker. As the Seventh Circuit has
recognized, "different decisionmakers may rely on different factors when deciding whether, and
how severely, to discipline an employee." *Ellis v. United Parcel Serv., Inc.,* 523 F.3d 823, 826
(7th Cir. 2008). Dr. Bradshaw and Ms. Warren did not report to the same supervisor  Dr. Bradshaw
was Ms. Warren's supervisor. [Filing No. 47-5 at 37.]  Dr. Bradshaw was, in turn, supervised by
Dr. Johnson. [Filing No. 47-5 at 37.]

Perhaps Ms. Warren is correct that supervisors should generally hold themselves to the same standards to which they hold their subordinates, but Ms. Warren has presented no evidence that Dr. Bradshaw was in a position to discipline himself.  Further, Ms. Warren's policy argument is irrelevant to the issue of whether Ms. Warren and Dr. Bradshaw were subject to the same decision maker.  Simply put, "employees that are subject to different decisionmakers are not similarly situated." *Phillips v. Spencer*, 793 F. App'x 435, 438 (7th Cir. 2019)*.; see also Moreland v. Nielsen*, 900 F.3d 504, 507–08 (7th Cir. 2018).

Second, and more problematic for Ms. Warren's claims, Dr. Bradshaw and Ms. Warren did not engage in the same conduct.  Dr. Bradshaw affirmatively disclosed his consulting work prior to his start date at IU and annually redisclosed consistent with the IU Conflicts Policy.  [Filing No. 47-4; Filing No. 47-9 at 1 ("I have an independent contractor/consulting agreement with [RNL] for strategic enrollment consulting.  The agreement term is January 1, 2016 and is a year to year contract.")  Dr. Bradshaw's consulting work was approved by IU, and a CMP was put into place. [Filing No. 47-8 at 4-5.]  Additionally, Dr. Bradshaw met with his supervisor at least annually to discuss his CMP.  [Filing No. 47-5 at 3-7; Filing No. 47-8 at 4-5.]

Unlike Dr. Bradshaw, Ms. Warren did not disclose her outside employment in a manner that is consistent with the IU Conflicts Policy.  While Ms. Warren argues that she "mentioned" that she was doing "some consulting work" to Dr. Bradshaw, the IU Conflicts Policy requires that all employees affirmatively disclose "any situation in which the employee has a real or potential conflict of interest through the annual Conflicts of Interest and Commitment online disclosure form."  [Filing No. 47-3 at 2.]  Ms. Warren does not claim to have done so.  Ms. Warren also admits that she never told anyone at IU about her specific employment with Sig Media.  [Filing No. 47-1 at 6.]

Additionally, Ms. Warren completed work for outside employers without a CMP in place. [Filing No. 47-1 at 6; Filing No. 47-6 at 2.]  While Ms. Warren argues that both she and Dr. Bradshaw engaged in the same conduct because Dr. Bradshaw purportedly violated the terms of his CMP by not using PTO to complete his outside employment, the Court need not take a position regarding Dr. Bradshaw's compliance with his CMP.  Ms. Warren's undisclosed outside employment, with no CMP in place, is easily distinguishable from Dr. Bradshaw's purported failure to follow his plan.  *Matthews v. Wal-Mart Stores, Inc.,* 417 F. App'x 552, 554 (7th Cir. 2011) ("employees are similarly situated only if they committed comparable policy violations.").

While this litigation has revealed Ms. Warren's personal knowledge of Dr. Bradshaw's purported non-compliance with his CMP, Ms. Warren has not introduced any evidence that Dr. Bradshaw's supervisor – or any other IU employee – was aware of Dr. Bradshaw failure to utilize PTO at the time of Ms. Warren's termination.  Ms. Warren admits that she never complained of Dr. Bradshaw's alleged misconduct to "anyone at IU."  [Filing No. 47-1 at 11-13.]  Because IU could not have "made excuses for" conduct that it was not aware was occurring, the Court finds that IU's lack of knowledge presents a "possible explanatory variable" that would preclude a factfinder from being able to isolate any discriminatory animus.  *Coleman*, 667 F.3d 835, 846; *Moore v. City Colleges of Chicago - Olive-Harvey Coll.*, 2018 WL 4222878, at *6 (N.D. Ill. Sept. 5, 2018).  Without evidence of knowledge, the factfinder would be forced to speculate about what IU would have done had it been aware of Dr. Bradshaw's alleged misconduct, rather than if discrimination was the motivating factor behind Ms. Warren's termination.  Accordingly, Dr. Bradshaw's failure to utilize PTO cannot be used as a meaningful comparator.

In short, the circumstances of Ms. Warren's and Dr. Bradshaw's employment – both at IU and outside of IU, are too dissimilar for a reasonable finder of fact to find that discriminatory

animus was the motivating factor behind Ms. Warren's termination.  Ms. Warren has failed to identify a similarly situated employee outside of her protected classes that received more favorable treatment and, thus, has failed to establish the final element of a prima facie case of race discrimination.

For the reasons discussed above, Ms. Warren has failed to establish the second and fourth requirements of her prima facie case and, thus, her race discrimination claim fails under the *McDonnell Douglas* framework.

b.    The *Ortiz* Holistic Approach

Ms. Warren also argues that she has established discrimination under the *Ortiz* holistic approach because the evidence, taken as a whole, would permit a reasonable factfinder to conclude that Ms. Warren's race caused her termination.  [Filing No. 52 at 26-30.]  Specifically, Ms. Warren argues that IU punished a Black employee but took no action against a White employee – Dr. Bradshaw – who "blatantly engages in the same conduct" for which Ms. Warren was terminated. [Filing No. 52 at 30.]

IU does not directly respond to Ms. Warren's argument under the *Ortiz* approach, but reiterates its argument that Ms. Warren has presented no evidence that IU's reason for terminating Ms. Warren was due to her race.  [Filing No. 58 at 15-17.]

Under *Ortiz*, the Court considers "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz,* 834 F.3d at 765.

Ms. Warren's claims also fall short under the *Ortiz* holistic approach.  When viewing the evidence as a whole, Ms. Warren has not presented evidence that would permit a reasonable factfinder to conclude that, but for her race, she would not have been fired.  *Id.* at 766.  Although

she alleges that she received different treatment than her White supervisor, Ms. Warren has not presented any evidence that her race factored into Dr. Bradshaw's decision to terminate her. Ms. Warren has also failed to present any evidence of an IU employee who was not terminated for failing to disclose his or her outside employment. *See Owens v. Old Wisconsin Sausage Co.,* Inc., 870 F.3d 662, 668 (7th Cir. 2017) (finding that Title VII claims fail when employee presented "no evidence" that employer had failed to act "when faced with evidence of similar conflict" by employees outside of her protected class).

For the reasons discussed above, Ms. Warren's race discrimination claim fails under both the *McDonnell Douglas* framework and the *Ortiz* approach. Accordingly, the Court **GRANTS** IU's Motion for Summary Judgment with respect to Ms. Warren's race discrimination claim.

### 2.    *Gender Discrimination*

Turning to Ms. Warren's gender discrimination claim, the parties set forth the same arguments as those outlined above concerning Ms. Warren's race discrimination claim. [Filing No. 46; Filing No. 52; Filing No. 58.]

### a.    The *McDonnell Douglas* Framework

As previously discussed, the *McDonnell Douglas* framework requires that Ms. Warren show that: (1) she is a member of a protected class; (2) she performed in accordance with IU's legitimate expectations; (3) she was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably in order to establish her prima facie case. *See David*, 846 F.3d at 225. The parties concede that Ms. Warren, a female who was terminated, has established the first and third requirements of her prima facie case. [Filing No. 46; Filing No. 52; Filing No. 58.] Rather, the parties' dispute centers around whether

Ms. Warren was meeting IU's legitimate expectations and whether similarly situated employees outside of her protected class were treated more favorably.

For the same reasons that Ms. Warren's race discrimination claim fails, Ms. Warren has not established her prima facie case under the *McDonnell Douglas* framework. With respect to Ms. Warren's performance, the undisputed evidence demonstrates that Ms. Warren failed to meet IU's expectations by failing to disclose her outside employment, and by completing work for outside employers during IU business hours without having a CMP in place. [Filing No. 47-3 at 13; Filing No. 47-5 at 5; Filing No. 47-13 at 3.]

Additionally, Ms. Warren has not identified a similarly situated employee outside of her protected class who received treated more favorable treatment. [Filing No. 47-3 at 13.] As with her race discrimination claim, Ms. Warren points to her male supervisor, Dr. Bradshaw, as a meaningful comparator. However, Dr. Bradshaw fails as a similarly situated employee because he does not report to the same decisionmaker as Ms. Warren, and Dr. Bradshaw did not fail to disclose his outside employment and, thus, did not engage in comparable policy violations. *Ellis,* 523 F.3d at 826; *Matthews.,* 417 F. App'x at 554.

For the reasons discussed above, Ms. Warren has failed to establish the second and fourth requirements of her prima facie case and, thus, her gender discrimination claim fails under the *McDonnell Douglas* framework.

b.    The *Ortiz* Holistic Approach

When viewing the evidence as a whole under the *Ortiz* approach, Ms. Warren has not presented evidence that would permit a reasonable factfinder to conclude that, but for her gender, she would not have been fired. *Ortiz,* 834 F.3d at 766. When considering claims of employment discrimination, the Court does not "sit as a super-personnel department, second-guessing an

23

employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." *Coleman*, 667 F.3d at 862 (internal citations omitted). Here, the undisputed evidence does not demonstrate any causal connection between Ms. Warren's termination and her gender. Accordingly, Ms. Warren's gender discrimination claim falls short under the *Ortiz* approach.

As with her race discrimination claim, Ms. Warren's gender discrimination claim fails under both the *McDonnell Douglas* framework and the *Ortiz* approach. Therefore, the Court **GRANTS** IU's Motion for Summary Judgment with respect to Ms. Warren's gender discrimination claim.

## IV.
## CONCLUSION

For the foregoing reasons, the Court **GRANTS** IU's Motion for Summary Judgment, [46]. Final judgment shall issue accordingly.

Date: 1/24/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**

24